UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| Blackout Management LLC, | |
| Plaintiff, | Civil Action File No. |
| v. | **JURY TRIAL DEMANDED** |
| Christopher Young and Sacrifice Management, LLC | |
| Defendants. | |

## COMPLAINT

Plaintiff Blackout Management LLC ("Blackout," or Plaintiff"), for its complaint against Christopher Young ("Young") and Sacrifice Management, LLC ("Sacrifice") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.    Blackout brings this action against Defendants for fraud, negligent misrepresentation, conversion, money had and received, and unjust enrichment, to seek redress for Defendants' deceitful conduct, including repayment of the significant sum of money that Defendants procured through fraudulent means.

2.    Blackout is an entertainment management firm based outside of Atlanta. Tasked with organizing and producing a revered music festival in Baltimore every year, Blackout entered discussions with Defendant Young, a booking agent

whom Blackout had previously worked with, to secure big-name musical artists to perform.

3.     Young, through his company Defendant Sacrifice, promised to furnish two of the hottest hip-hop artists in the world, and represented to Blackout that to secure their services, Blackout would have to make a significant good-faith deposit. Having worked with Defendants before, Blackout had no reason to believe Defendants would not deliver.

4.     Unfortunately, and unbeknownst to Blackout at the time, this was a sham. Defendants never intended to make any real effort to secure their services. Instead, Defendants collected the deposit, did not try to formally secure the artists, and lied about it for months, reassuring Blackout that necessary materials such as contracts, riders, and promotional biographies and photographs were going to be delivered, while blaming the artists' management team for delays.

5.     Three months after first collecting the deposit from Blackout, Defendants abruptly notified Blackout that the artists were no longer available to perform. This did not add up; the entire reason for the deposit was to secure their availability. Unfortunately, as Blackout confirmed with their management teams, Defendants never entered into formal talks to secure the artists' services, and never forwarded the deposit. Instead, Defendants pocketed the deposit and misled Blackout for months.

6.      Due to Defendants' representations, and Blackout's reliance thereon, Blackout has faced significant harm. Setting aside that Blackout was forced to quickly pivot and secure new talent at the last minute to ensure that the show would go on, Blackout has yet to receive its money back from Defendants, despite repeated demands. Instead, Defendants delayed by leading on Blackout for several more months, agreeing—not once, but twice—to enter into a settlement to resolve the dispute, only to back out at the last minute and refuse to consummate that settlement.

7.      Forced with no other choice, Blackout now brings this action seeking actual and compensatory damages, punitive damages, and attorney's fees and costs, to recover for the harm caused by Defendants' willful, fraudulent, and wanton misconduct.

## **PARTIES**

8.      Plaintiff Blackout is a limited liability company organized under the laws of Georgia. It maintains its principal place of business in Gwinnett County, Georgia. Its sole member and owner is Nicola Blandon, a citizen of Georgia and resident of Gwinnett County, Georgia.

9.      Defendant Christopher Young is an individual that resides in Pomona, New Jersey.

10.     Defendant Sacrifice Management, LLC is a limited liability company organized under the laws of New Jersey. It maintains its principal place of business

in New Jersey. Upon information and belief, its sole member and owner is Christopher Young, a citizen and resident of New Jersey.

## JURISDICTION AND VENUE

11.　Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction, as every plaintiff is completely diverse in citizenship from every defendant, and the amount in controversy exceeds the sum of $75,000.00. Blackout is a citizen of Georgia, and Young and Sacrifice are citizens of New Jersey.

12.　This Court has personal jurisdiction over all Defendants pursuant to O.C.G.A. § 9-10-91. Defendants transact significant, persistent business within this state, and this action arises out of a transaction with Blackout, whom Defendants have worked with for many years. Furthermore, Defendants caused tortious injury in this state, and regularly do or solicit business and/or derive substantial revenue from services rendered in this state.

13.　Pursuant to 28 U.S.C. § 1391, venue is proper in this District as it is the judicial district in which a substantial number of the events or omissions giving rise to these claims occurred, and Defendants are subject to jurisdiction in this District.

## FACTS COMMON TO ALL COUNTS

*The Parties Collaborate to Plan a Music Festival*

14.　Plaintiff Blackout is an entertainment company which focuses on artist management, promotions, and live events. Founded in 2015 by industry veteran

Nicola Blandon ("Blandon"), Blackout provides top-tier talent management services for live festivals and corporate events, including talent procurement and onsite talent management.

15.    Since 2016, Blackout has been the main music organizer for the prestigious AFRAM Festival (the "Festival"), a major live festival held every summer in Baltimore's Druid Hill Park. Billed as Baltimore's official Juneteenth celebration, the Festival has become a cultural institution in Baltimore, drawing crowds of over 150,000 people each day.

16.    Given the many moving parts that go into putting on a major live event, Blackout's work securing talent for the 2025 Festival, scheduled for June 21 and 22, began nearly a year earlier. In particular, Blackout, through Blandon, initiated discussions with Defendant Young and his company Sacrifice about possible talent for the Festival on or about September 21, 2024, while they were both working at another music festival that day.

17.    In addition to discussions with Young, Blandon also initiated discussions with another individual in the music industry, Brian Dickens (on behalf of his company, BD Management, Inc.). Together, the three of them had an understanding to collaborate on and share responsibility for securing talent for the Festival, based on phone conversations and memorialized in group text messages. As such, at all relevant times, the communications alleged herein took place largely

between Blandon, Dickens, and Defendant Young.

18.    While Blandon had worked with Dickens on several events in the past, her relationship with Young stretched back much farther. In particular, Blandon and Young started working together in 2018, when Blackout had organized an event and sought to secure another artist that Defendant Young was managing at the time. Having worked with Defendant Young on numerous occasions, Blandon had no reason to believe Defendant Young would act in an unscrupulous manner. Unfortunately, Blandon was wrong.

*Defendants Coerce Payment From Blackout on the False Representation That They Had Secured Talent, and Then Lied About it for Months*

19.    Over the course of Blandon's discussions with Dickens and Young in late September, October, and November 2024, the three individuals put together a game plan to secure an artist roster for the Festival. This involved first deciding on the headliner—or the main act—and then building a roster of supporting acts.

20.    After Blackout's plans to secure another headliner fell through, Defendant Young, on a telephone call with Dickens and Blandon on or around November 20, 2024, suggested that they could secure Jaylah Ji'mya Hickmon p/k/a Doechii ("Doechii") as a headliner. He further suggested that they book Sir Darryl Andrew Farris ("SiR"), an artist under the same record label and management firm, Top Dawg Entertainment ("TDE"), who Young had sought to place at a previous music festival.

21.     Thereafter, Young contacted Adam Sherif, a talent agent at William Morris Endeavor ("WME"), by email to inquire about booking them. Sherif relayed back that to secure Doechii and SiR's services, a 50% deposit would be due "on confirmation and prior to any announcement," with the remaining balance paid one month before the Festival.

22.     Young texted a screenshot of the email to Blandon on December 17, 2024 to confirm they were available. But on a subsequent planning call with Blandon and Dickens that same day, Young represented that he could book Doechii and SiR through TDE directly, bypassing any talent agent fees. He conveyed that he could do so because he had a personal relationship with an executive at TDE, and had worked with TDE when trying to book SiR previously. He further represented that to secure Doechii and SiR, Blackout would need to transfer a 50% deposit—amounting to $187,500 (the "Deposit")—by no later than December 23, 2024, so that he could convey it to TDE prior to the holidays.

23.     Based on this understanding, Blackout built out a roster of supporting acts that Blandon and Dickens would be responsible for securing. While the supporting acts are major artists in their own right, one even agreed to reduce his performance fee on the understanding that Doechii and SiR would headline, given the significant visibility such hot-ticket acts would bring to the event.

24.     On December 16, 2024, Young represented to Blandon that to secure

Doechii and SiR's performances, Young would need a deposit of 50% (representing the $187,500) no later than December 23, 2024. The next day, Young asked Blandon: "What's the earliest you can get me Doechii and sir deposit?" Blandon reassured Young that the payment was forthcoming.

25.   Based on the understanding that Young would secure Doechii and SiR's performances and furnish their performances for the Festival, Blackout transferred the Deposit to Sacrifice on December 23, 2024. The Deposit—representing the sum total of $187,500—was made via wire transfer, and it was accompanied by the following description: "DEPOSIT FOR DOECII [sic] AND SIR." That same day, while on a call with Blandon and Dickens, Young stated that Doechii and SiR were confirmed.

26.   Operating under this belief, Blandon started requesting the necessary materials from Young, such as promotional artist materials, performance contracts, and riders. This is when the trouble began.

27.   Given the holiday season, Blandon did not immediately ask for these assets. But on January 9, 2025, having still not received any indication from Young that assets were being prepared—including the necessary contracts and artist promotional materials—Blandon reminded Young that Blackout was still waiting on these materials. Young apologized for the delay and noted that he was still waiting on the materials from TDE but that they were delayed due to the recent fires in Los

Angeles.

28.    Sensitive to this, Blandon did not immediately follow up, believing that the materials would come in due course. However, on January 22, nearly two weeks later, Young had still provided no updates nor a timeline for when Blackout might receive the assets, prompting Blandon to ask once again when Blackout could expect them. This time, Young responded that he would see the TDE team at the Superbowl on February 9, 2025 (because TDE worked with the half-time show performer) and would firm down the date for supplying those assets when he sees him.

29.    Unfortunately, Young did not provide a firm date but continued to make excuses, and this became a pattern. The week after the Super Bowl, Blandon inquired again on a call with Young and Dickens, prompting Young to make more excuses, such as suggesting that the artists had not yet given approval over the promotional materials. She again asked for materials on February 18, February 28, March 3, and finally, on March 6, when she explained to Young that the assets "must be turned in by tomorrow." Each time, Young assured Blandon that he was working with TDE to get her the materials and even provided Blandon with a concert rider for SiR to show that he was committed to providing them. Yet he still could not commit to providing the remainder of the materials by a date certain, even as the Festival was fast approaching.

30.    Finally, on March 10, Young—despite assuring Blandon that he would

provide the necessary materials for months—abruptly informed her that Doechii and SiR were no longer available to perform. Specifically, on a phone call with Blandon and Brian Dickens, Young represented that the artists were pulling out of the Festival. When pressed, he explained that they were preparing for a tour that would be starting around the same time. Of course, this made no sense, assuming that Young had secured their performances back in December 2024. But as Blandon soon learned, this was not the case.

31.    While Blandon had long given Young the benefit of the doubt, his recent actions led Blandon to question his bona fides. Accordingly, on the same day Young informed Blandon that Doechii and SiR pulled out of the Festival, Blackout's representative reached out to a representative at TDE. In that conversation, TDE's representative confirmed that Defendant Young had been lying for months. In particular, while Defendant Young had led Blandon to believe that he had secured Doechii and SiR's performance months ago and that their managers were the cause for the delay in receiving assets, in reality, Defendant Young *never spoke to anyone at TDE about securing Doechii's performance* and had, at most, preliminary conversations about SiR.

32.    This put Blackout in a precarious situation. With the Festival fast approaching, Blackout no longer had headliners. And one of the main supporting acts—who had agreed to perform at a discount to be billed under Doechii—now had

to be paid a higher fee. Making matters worse, Young had damaged Blackout's relationship and credibility with TDE.

*Caught in a Lie, Defendants Refuse to Return the Deposit*

33.    Upon discovering that Young was lying and that Blackout would have to pivot to find a new headliner for the Festival, Blandon promptly requested that Defendants return the Deposit. On March 10—the same day Young notified Blandon that Doechii and SiR had pulled out, and the same day that Blandon confirmed with TDE that this was a lie—Blandon and her husband got on the phone with Young to demand the return of the Deposit. Young refused.

34.    On March 12, Blandon wrote to Young: "I have been extremely patient with you, asking you to return funds that you received to secure DOECHII and SIR, which you NEVER did, which is documented." However, despite having no basis to retain the Deposit, Young refused to return it, forcing Blandon to retain counsel.

35.    Over the next two months, the parties tried to resolve their differences through counsel. However, this proved to be fruitless, as Defendants were apparently not willing to settle in good faith.

36.    Specifically, starting in March and culminating in early May 2025, the parties ironed out a six-figure settlement agreement between Blackout and Sacrifice, the terms of which were confirmed and agreed to by Defendants' counsel by email, and which Young—on behalf of Sacrifice—signed on or about May 6, 2025 (the

"First Settlement Agreement"). Pursuant to the First Settlement Agreement, Sacrifice agreed to make a settlement payment to Blackout "[n]o later than May 12, 2025, 5:00 PM Eastern Daylight Savings Time." No release of liability was granted unless "full and timely payment" was made.

37.     Unfortunately, payment was neither full nor timely. Instead, for nearly two weeks *after* the payment deadline, Blackout's counsel was forced to repeatedly inquire why Defendants had still not made payment. On May 23, 2025, Blackout's counsel gave one final ultimatum, writing to Defendants' counsel: "This will serve as our final notice. If the wire transfer is not received in my client's account by end of business on Friday, May 23, 2025, my client will have no choice but to conclude that your client has abandoned the settlement and will proceed with filing litigation." That same day, Defendants' counsel wrote: "Understood entirely. Thank you for the update." This was the last communication from Sacrifice's counsel.

38.     Thereafter, Defendants simply ignored Blackout's requests for payment, forcing Blackout to now retain litigation counsel in preparation for filing the instant action. To make matters worse, Blackout learned that as recently as July 2025, Young was trying to save face by falsely representing to third parties in the music industry, including Brian Dickens, that the dispute with Blackout had been resolved.

39.     On July 3, the undersigned wrote again to Defendants' counsel to notify

them that the claims had not been resolved, and that if Defendants refused to return the Deposit, Blackout would be forced to file this lawsuit. In response, Young himself, who was no longer retained by counsel, responded on July 11, requesting to have a conversation with Blandon directly to resolve the dispute.

40.    Unfortunately, this proved to be yet another delay tactic. On July 18, 2025, after a telephone conversation between Blandon and Young, Young confirmed to Blandon by text message that he would return the Deposit no later than August 1. This prompted the undersigned to draw up another settlement agreement between Blackout, on one hand, and Defendants, on the other hand (the "Second Settlement Agreement"). Pursuant to the Second Settlement Agreement, payment was to be made by August 1—in line with Young's representations to Blandon.

41.    That deadline came and went, and Defendants have, once again, refused to abide by their promises. Blackout has thus been left with no other choice but to file this action seeking recourse for the harm caused.

## COUNT ONE
### FRAUD
### (O.C.G.A. § 23-2-51)

42.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1-41 as though set forth fully herein.

43.    Defendants—through Young—represented to Blackout that they could secure the performances of two major hip-hop artists at the Festival, and then

repeatedly represented to Blackout that their performances had been secured. These representations, starting with Young's representation on November 20, 2024, were entirely false.

44.    Defendants were aware that the artists' performances would not be secured. Instead, Defendants made these representations to induce Blackout to transfer the $187,500 Deposit to Defendants.

45.    Blackout did, in fact, rely on the false statements, to transfer the Deposit to Defendants on December 23, 2024. That reliance was reasonable, including *inter alia* because of the parties' longstanding business relationship and course of dealings.

46.    As a result of Blackout's reliance on Defendants' false statements, Blackout has been damaged in an amount to be proven at trial, but in any event no less than $187,500.

47.    Defendants' conduct has been willful, wanton, malicious, and fraudulent, with conscious disregard for the consequences of their actions, entitling Blackout to punitive damages under O.C.G.A. § 51-12-5.1.

48.    Moreover, Defendants' actions have been in bad faith and caused Blackout unnecessary trouble and expense, meriting an award of Blackout's attorney's fees and costs incurred in this action under O.C.G.A. § 13-6-11. Defendants not only lied to Blackout for months to induce Blackout to transfer the

Deposit; Defendants also lied to Blackout for months *after* being caught in the first lie, forcing Blackout to incur significant time and expense negotiating and drafting not one, but two, settlement agreements that Defendants abandoned, despite explicitly agreeing and promising to make payment to Blackout according to their terms.

**COUNT TWO**
**NEGLIGENT MISREPRESENTATION**
**(Georgia Common Law)**

49.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1-41 as though set forth fully herein.

50.    Defendants had a duty to Blackout to be truthful in their business dealings. Yet, Defendants falsely represented to Blackout that they could secure the performances of two major hip-hop artists at the Festival, and then repeatedly represented to Blackout that their performances had been secured, neglecting to inform Blackout that Defendants had, in fact, not secured their performances.

51.    Defendants also falsely represented to Blackout that the Deposit would be used to secure the aforesaid performances, inducing Blackout to transfer the Deposit to Defendants.

52.    Blackout reasonably relied on Defendants' false representations in transferring the Deposit, which Defendants have now refused to return.

53.    As a result of Blackout's reliance on Defendants' false statements,

Blackout has been damaged in an amount to be proven at trial, but in any event no less than $187,500.

54.    Defendants' conduct has been willful, wanton, malicious, and fraudulent, with conscious disregard for the consequences of their actions, entitling Blackout to punitive damages under O.C.G.A. § 51-12-5.1.

55.    Moreover, Defendants' actions have been in bad faith and caused Blackout unnecessary trouble and expense, meriting an award of Blackout's attorney's fees and costs incurred in this action under O.C.G.A. § 13-6-11. Defendants not only lied to Blackout for months to induce Blackout to transfer the Deposit; Defendants also lied to Blackout for months *after* being caught in the first lie, forcing Blackout to incur significant time and expense negotiating and drafting not one, but two, settlement agreements that Defendants abandoned, despite explicitly agreeing and promising to make payment to Blackout according to their terms.

**COUNT THREE**
**CONVERSION**
**(O.C.G.A. § 16-8-4)**

56.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1-41 as though set forth fully herein.

57.    Defendants, through their representations to Blackout, were entrusted with, came into possession of, or otherwise obtained control over funds belonging

to Blackout in the amount of $187,500, which constituted a specific, identifiable sum of money.

58.    Blackout had a possessory interest in the Deposit and was entitled to its immediate return upon learning that the funds were not properly handled by Defendants.

59.    Defendants, without authorization and in derogation of Blackout's rights, exercised dominion and control over said funds, inconsistent with Blackout's ownership interest.

60.    Despite Blackout's repeated demand for the return of the Deposit, Defendants have failed and refused to return it and continue to wrongfully retain possession of it.

61.    Blackout reasonably relied upon Defendants' false representations in transferring the Deposit, which Defendants have now refused to return.

62.    As a result of Defendants' conduct, Blackout has been damaged in an amount to be proven at trial, but in any event no less than $187,500.

63.    Defendants' conduct has been willful, wanton, malicious, and fraudulent, with conscious disregard for the consequences of their actions, entitling Blackout to punitive damages under O.C.G.A. § 51-12-5.1.

64.    Moreover, Defendants' actions have been in bad faith and caused Blackout unnecessary trouble and expense, meriting an award of Blackout's

attorney's fees and costs incurred in this action under O.C.G.A. § 13-6-11. Defendants not only lied to Blackout for months to induce Blackout to transfer the Deposit; Defendants also lied to Blackout for months *after* being caught in the first lie, forcing Blackout to incur significant time and expense negotiating and drafting not one, but two, settlement agreements that Defendants abandoned, despite explicitly agreeing and promising to make payment to Blackout according to their terms.

## COUNT FOUR
### MONEY HAD AND RECEIVED
### (Georgia Common Law)

65.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1-41 as though set forth fully herein.

66.    Defendants received payment of $187,500 from Blackout, to which Defendants have no legal or equitable right.

67.    The money was received by Defendants under circumstances that make it unjust, inequitable, and unconscionable for Defendants to retain it.

68.    Blackout has demanded repeatedly that Defendants return the money, but Defendants have failed and refused to do so.

69.    Out of equity and good conscience, Defendants should not retain this money.

70.    As a result of Defendants' retention of the money, Blackout has been

damaged in an amount to be proven at trial, but in any event no less than $187,500.

71.    Defendants' conduct has been willful, wanton, malicious, and fraudulent, with conscious disregard for the consequences of their actions, entitling Blackout to punitive damages under O.C.G.A. § 51-12-5.1.

72.    Moreover, Defendants' actions have been in bad faith and caused Blackout unnecessary trouble and expense, meriting an award of Blackout's attorney's fees and costs incurred in this action under O.C.G.A. § 13-6-11. Defendants not only lied to Blackout for months to induce Blackout to transfer the Deposit; Defendants also lied to Blackout for months *after* being caught in the first lie, forcing Blackout to incur significant time and expense negotiating and drafting not one, but two, settlement agreements that Defendants abandoned, despite explicitly agreeing and promising to make payment to Blackout according to their terms.

## COUNT FIVE
## UNJUST ENRICHMENT
### (Georgia Common Law)

73.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1-41 as though set forth fully herein.

74.    Blackout conferred a benefit upon Defendants, including but not limited to the payment of the $187,500 Deposit.

75.    Defendants knowingly accepted and retained the benefit conferred by

Blackout.

76.    Defendants' retention of this benefit was and is unjust, inequitable, and without legal justification, particularly in light of the circumstances under which the benefit was conferred.

77.    Despite Blackout's repeated demand, Defendants have failed and refused to return the value of the benefit conferred.

78.    As a result of Defendants' conduct, it has been unjustly enriched at Blackout's expense in an amount to be proven at trial, but in any event no less than $187,500.

79.    Defendants' conduct has been willful, wanton, malicious, and fraudulent, with conscious disregard for the consequences of their actions, entitling Blackout to punitive damages under O.C.G.A. § 51-12-5.1.

80.    Moreover, Defendants' actions have been in bad faith and caused Blackout unnecessary trouble and expense, meriting an award of Blackout's attorney's fees and costs incurred in this action under O.C.G.A. § 13-6-11. Defendants not only lied to Blackout for months to induce Blackout to transfer the Deposit; Defendants also lied to Blackout for months *after* being caught in the first lie, forcing Blackout to incur significant time and expense negotiating and drafting not one, but two, settlement agreements that Defendants abandoned, despite explicitly agreeing and promising to make payment to Blackout according to their

terms.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

1. Compensatory damages against Defendants in an amount to be determined at trial, but in any event no less than $187,500;

2. Punitive damages against Defendants in an amount to be determined at trial pursuant to O.C.G.A. §51-12-5.1;

3. Prejudgment and post-judgment interest at the applicable rate;

4. Plaintiff's attorney's fees, expenses, and costs of suit pursuant to O.C.G.A. §13-6-11; and

5. Such other and further relief that this Court deems just and proper.

Dated:    August 13, 2025                Respectfully submitted,

*/s/ James M. Slater*
James M. Slater
Georgia Bar No. 169869
Slater Legal PLLC
2296 Henderson Mill Rd NE Suite 116
Atlanta, Georgia 30345
Tel. (404) 458-7283
james@slater.legal

Leo M. Lichtman (*pro hac vice forthcoming*)
ESCA Legal LLC
1117 Sixth Avenue, Fifth Floor
New York, NY 10036
Tel.: (347) 745-2535
leo@esca.legal

***Attorneys for Plaintiff Blackout Management LLC***